STATE of Wisconsin, Plaintiff-Respondent,

v.

Scott T. BIDWELL, Defendant-Appellant.†

Court of Appeals

*No. 95–0791–CR. Submitted on briefs December 29, 1995.—Decided February 14, 1996.*

(Also reported in 546 N.W.2d 507.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the brief of *Martin I. Hanson* of *Hanson, Gasiorkiewicz & Weber, S.C.* of Racine.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Daniel J. O'Brien*, assistant attorney general.

Before Anderson, P.J., Brown and Nettesheim, JJ.

ANDERSON, P.J.   Scott T. Bidwell appeals from a judgment of conviction for second-degree reckless homicide while armed with a dangerous weapon, and second-degree reckless injury while armed with a dangerous weapon, contrary to §§ 940.06, 940.23 and 939.63(1)(a)2 and 3, STATS. Bidwell contends that his automobile is not a dangerous weapon; therefore, the trial court should not have found him guilty of the dangerous weapon penalty enhancers. We conclude

that Bidwell's automobile constituted a dangerous weapon under § 939.22(10), STATS. Accordingly, we affirm the judgment of conviction.

The criminal complaint alleged that around 1:00 p.m., Bidwell was driving his Ford Bronco erratically, "weav[ing] back and forth between other vehicles in traffic." A witness said that the driver of the Bronco, after driving left into oncoming traffic, made no attempt to get back into the right lane. The complaint continued to allege the following:

> [T]he Bronco crossed over the center line into the southbound lane. A blue Oldsmobile automobile traveling southbound on 22nd Avenue swerved toward the west ditch but the Bronco didn't make any attempt to avoid hitting the Oldsmobile which the Bronco struck in the left rear quarter panel. The Bronco then went into a ditch and began "to flip side over side." Mr. Coogan stopped and saw that a white Dodge was also in the ditch.

Rescue personnel removed seven-year-old Katie Rasch and her mother, Valeria Rasch, from the white Dodge. Valeria and Katie were taken to the hospital. Valeria was pronounced dead and Katie was transferred to Children's Hospital in Wauwatosa, Wisconsin. An emergency room physician testified at the preliminary hearing that Katie suffered from "Bilateral femur fractures to both of her legs which were broken."

Bidwell's alcohol report showed a blood/alcohol level of .202% within forty-five minutes of the accident. Bidwell entered pleas of not guilty to one count of second-degree reckless homicide while armed with a dangerous weapon and one count of second-degree reckless injury while armed with a dangerous weapon. Bidwell agreed to waive his right to a jury trial and

have the court decide the issue of whether he should be charged with the dangerous weapon penalty enhancers. Both parties agreed to allow the trial court to use the preliminary hearing transcript as a factual basis for its determinations. Bidwell stipulated that the transcript met the necessary requirements for proving the predicate offenses in both counts and left for litigation and argument the sole issue of whether the facts and/or law supported the charge of use of a dangerous weapon as to both counts. The trial court subsequently found Bidwell guilty of second-degree reckless homicide while armed with a dangerous weapon and second-degree reckless injury while armed with a dangerous weapon. Bidwell appeals.

■■■■■

Bidwell argues that his automobile does not constitute a dangerous weapon under §§ 939.63(1)(a) and 939.22(10), STATS. Whether Bidwell's automobile falls within the definition of a "dangerous weapon" requires the interpretation of § 939.22(10). The interpretation of a statute is a question of law which we review de novo. *State v. Sinks*, 168 Wis. 2d 245, 253, 483 N.W.2d 286, 289 (Ct. App. 1992). Because we conclude that § 939.22(10) is clear and unambiguous for purposes of this appeal, we need not look beyond the plain language of the statute in reaching our decision. *See Sinks*, 168 Wis. 2d at 253, 483 N.W.2d at 289.

Section 939.63, STATS., provides in relevant part:

> **Penalties; use of a dangerous weapon.**
> (1)(a)  If a person commits a crime while possessing, using or threatening to use a dangerous weapon, the maximum term of imprisonment prescribed by law for that crime may be increased as follows . . . .

Section 939.22(10), STATS., defines "dangerous weapon" as:

> [A]ny firearm, whether loaded or unloaded; any device designed as a weapon and capable of producing death or great bodily harm; any electric weapon, as defined in s. 941.295(4); or any other device or instrumentality which, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm.

Bidwell is correct in asserting that the focus of the dispute is whether the automobile he used constitutes "any other device or instrumentality which, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm." *See id.*

Bidwell argues: "Absent a showing that the defendant intended to strike Valeria and Katie Rasch with his vehicle, the deadly weapons statute is inapplicable to this case." He further contends that "no one even alleges that [he] used or intended to use his vehicle as a weapon. He certainly had no intent to harm anyone."

We begin by analyzing the relevant phrase "any other device or instrumentality which, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm." Section 939.22(10), STATS. There are two components in this phrase: (1) the use component consisting of "in the manner it is used" or "intended to be used" and (2) the result component consisting of "is calculated" or "likely to produce death or great bodily harm." Having a use and a result component requires that there be a convergence of use and result before any device can become a dangerous weapon.

Within each of these two components, there is optional language. As to the result component, the

instrumentality must be either: (1) *calculated* to produce death or great bodily harm or (2) must be *likely* to do the same. Here, there is little doubt that Bidwell's behavior in driving drunk and erratically during midday traffic was likely to produce death or great bodily harm. And, indeed it did. Valeria died as a result of the accident and Katie's legs were seriously injured.[1] With the result component being satisfied, we move on to the use component.

Similar to the result component, the use component can be satisfied by either of two options. The instrumentality must be likely to produce death or great bodily harm either: (1) in the manner it is used or (2) intended to be used. Under the facts of this case, we conclude that the language "in the manner it is used" is the applicable phrase. We are satisfied that the word "manner" is the operative word. The automobile was used in a manner that was likely to produce death or great bodily harm. Taking this position, we reject Bidwell's argument that he must have *intended* to use his vehicle to produce death or great bodily harm. This portion of the statute does not require intent and we

---

[1] The emergency room physician testified as to Katie's injuries:

Q   Could you just expand for a minute on the nature of the fractures to Katie Rasch's legs?

A   She had fractures of both of her femurs, her thigh bone, the large bone in her legs, just above the kneecap, involving her growth plate for both of those legs.

Q   Did you say growth plate?

A   Yes.

Q   What does that mean?

A   At the end of the long bones of a child, they have growth panels or physeal plates, and that is where the bone continues to grow, and the fractures were at those sites.

will not read such a requirement into its plain language.

We conclude that under the facts of this case Bidwell committed a crime while using a dangerous weapon. That is, he used an instrumentality which, in the manner it was used, was likely to produce death or great bodily harm. We caution, however, that this determination is saved for the most egregious circumstances.[2] The facts of this case reflect such circumstances. At the sentencing hearing, the trial court stated: "Not only was this a tragedy but it was exacerbated by the prior offenses for which the defendant stood convicted, all involving driving and drinking."[3]

---

[2] We agree with the State's characterization of this case:

> This is the case of a drunk driver who operated his car recklessly for miles in heavy traffic near the City of Kenosha in mid-day with a blood/alcohol level twice the legal limit. The appellant was fully aware of the risk as he had been arrested for drunken and reckless driving several times in the past.

[3] The presentence investigation report lists Bidwell's prior offenses relating to drunk driving:

> On 5/19/84 the defendant was arrested for Operating a Motor Vehicle While Intoxicated . . . . He was cited for having a blood alcohol content over .13%. The defendant was arrested on 10/13/87 when a City of Kenosha Police Officer observed the defendant traveling in the 7400 block of 28th Avenue at a high rate of speed. He turned west onto 73rd Street in front of the officer's vehicle and was traveling at a high rate of speed when he slammed on his brakes at the stop sign at 30th Avenue. He then pulled out in front of a Chevy Blazer, forcing the Blazer off the road and onto the sidewalk. The officer activated his siren and lights but the defendant continued driving. He eventually stopped in the 3400 block of 75th Street. When the officer approached the defendant's vehicle, the defendant stated, without being asked by the officer, that he [had] no driver's license and stated that he was really drunk. The defendant's blood

The egregiousness of this case is exemplified in witness testimony. Craig Coogan testified that Bidwell had pulled up behind him "real close to my rear bumper and stopped kind of crooked" when he was stopped at a red light. Coogan stated that Bidwell was "[w]orking his way through traffic, and he just couldn't keep it in a straight line. Always moving. Slaloming." Coogan also testified as follows:

Q And what observations did you make of the Ford Bronco?

A He was swerving into the shoulder and then to the center line and onto the shoulder.

. . . .

A This continued north of Highway E, and then from there he swung onto the shoulder and went across the center line and all the way across back onto the shoulder, and then back across. The vehicle had to be 3/4ths of a way across the center line, and I don't think he came back. That's when he struck the first guy.

. . . .

alcohol content was measured on that date at .17% and he received the following citations: Operating a Motor Vehicle While Intoxicated, 2nd Offense; Operating a Motor Vehicle After Revocation, 2nd Offense; Operating a Motor Vehicle with Blood Alcohol Content of .10% or Above and Endangering Safety by Reckless Driving. According to the Department of Transportation record which was received by this office, the defendant's driver's license was revoked for five years on 12/9/87 under the classification of a Habitual Traffic Offender. The defendant was again convicted of Operating While Intoxicated on 2/25/93 as a result of a blood alcohol content violation on 1/7/93. His driver's license was suspended for six months. Also according to the DOT record, the defendant was convicted on 12/15/93 as a result of a violation on 11/25/93 for Operating Without a License.

Q   What did he do next at that point of collision?

A   He hit the blue car and the blue car violently spun onto the shoulder and back up onto the road. From there he began to violently flip in a sideways direction . . . .

. . . .

Q   Then what happened?

A   He struck something else, and he was pushed, it would have been another on-coming car, and he was pushed onto the front lawn or the ditch of the farmhouse.

Additionally, Deputy David Heiring testified as follows:

A   I got there, got out of my car, and heard what sounded like a small child crying somewhere.

Q   What did you do?

A   It was coming from the white vehicle. I went to the car and got the back door open and found a girl on the floor.

Q   And what was the little girl doing?

A   Hysterically crying. Asking for her mother. I just stayed with her until the Rescue Squad got there.

. . . .

Q   And what did you and the little girl talk about?

A   I just tried to comfort her. She kept asking for her mother, and her mother was in the car. I thought she was deceased at the time.

Q   What caused you to think she was deceased?

A   The noises coming from the mother, and no motion, and the way she was pinned in the vehicle.

We conclude that an automobile may constitute a dangerous weapon under § 939.22(10), STATS., where the evidence exists to charge a defendant with a dangerous weapon penalty enhancer and the circumstances are egregious.

*By the Court.*—Judgment affirmed.